873 A.2d 463

**Elsie L. BENJAMIN, Individually, etc.**

v.

**UNION CARBIDE CORPORATION, et al.**

No. 959, Sept. Term, 2004.

Court of Special Appeals of Maryland.

May 3, 2005.

174

Timothy J. Hogan, Baltimore, for Appellant.

Laura A. Cellucci and Philip A. Kulinski (Steven J. Parrott, DeHay & Elliston, L.L.P.; George M. Church, Miler & Stockbridge, on the brief), Baltimore, for Appellee.

Panel: MURPHY, C.J., HOLLANDER and JAMES R. EYLER, JJ.

JAMES R. EYLER, Judge.

On March 20, 2003, Elsie L. Benjamin, appellant, as surviving spouse and on behalf of Robert L. Benjamin II and Carol Jeffers, surviving children of Robert L. Benjamin, Sr.,[1] and as personal representative of the estate of Robert L. Benjamin, Sr., the decedent, filed suit in the Circuit Court for Baltimore City against various defendants, including Georgia Pacific Corporation and Union Carbide Corporation, appellees. In appellant's survival[2] and wrongful death actions,[3] appellant

---

1. The surviving spouse and children are sometimes referred to as the beneficiaries, denoting their status as use plaintiffs in the wrongful death action.

2. Md. Code (1974, 2001 Repl. Vol., Supp. 2004), § 7–401(y) of the Estates & Trusts Article.

3. Md. Code (1974, 2002 Repl. Vol.), §§ 3–901 to 3–904 of the Courts & Judicial Proceedings Article.

alleged that the decedent died on May 25, 1997, as a result of contracting mesothelioma caused by exposure to asbestos containing products manufactured by the defendants.[4] Appellees moved for summary judgment on the ground that the actions were barred by limitations.

Appellant asserted below and continues to assert on appeal that there is no evidence that the decedent had actual knowledge that his disease was caused by exposure to asbestos, and there is no evidence that appellant or the decedent's children had actual knowledge that the disease was caused by exposure to asbestos, until late 2001 or early 2002. Appellant contends that actual express knowledge of (1) the nature of the disease, (2) exposure to asbestos, and (3) a causal connection between the disease and the exposure is necessary for the causes of action to accrue. Conversely, appellees asserted, and continue to assert, that the actual express knowledge possessed by the decedent and appellant, *i.e.*, the diagnosis of mesothelioma, was sufficient to put them on inquiry notice, no later than the spring of 1997, that the decedent's exposure to asbestos was the cause of his mesothelioma.

The circuit court entered summary judgment in favor of appellees.[5] The court reasoned that actual express knowledge of the diagnosis of mesothelioma and asbestos exposure was sufficient for the causes of action to accrue and concluded that the actions were barred by limitations. The court did not clearly distinguish between the survival and wrongful death actions in coming to its conclusion.

---

4. The term mesothelioma generally denotes malignant tumors in the pleura, the membrane surrounding the lungs. In 1964, studies confirmed that asbestos exposure is a primary cause of mesothelioma. *Wilson v. John Crane, Inc.*, 385 Md. 185, 193, 867 A.2d 1077 (2005) (quoting *Owens–Corning Fiberglas Corp. v. Garrett*, 343 Md. 500, 506–507 n. 2, 682 A.2d 1143 (1996)).

5. The court granted the motion after a hearing held on April 20, 2004. A motions hearing had been held previously, on November 25, 2003, but the court declined to grant summary judgment at that time.

As we shall explain, we agree with the circuit court that express knowledge of mesothelioma and asbestos exposure was sufficient to put the decedent on inquiry notice in his lifetime. Thus, we shall affirm the judgment with respect to the survival action. Contrary to appellant's contention, express knowledge of a causal connection was not necessary for inquiry notice.

Contrary to appellees' contention, we conclude that express knowledge of the diagnosis of mesothelioma alone was insufficient to satisfy, as a matter of law, the inquiry notice requirement. Because there is no evidence that the express knowledge of appellant or that of the surviving children was more than the diagnosis of mesothelioma, we shall reverse the judgment with respect to the wrongful death action.

## Factual Background

In the complaint and in answers to interrogatories, appellant asserted that the decedent was employed as a laborer and carpenter while (1) in the United States Navy from 1943 to 1945, (2) working for the L.H. Benjamin Co. from 1946 to 1961, and (3) working for the R.L. Benjamin Lumber Co. from 1961 to 1971. According to appellant, the decedent was exposed to asbestos containing products at various times throughout his employment, including while working for the Benjamin companies, which stocked and sold several products containing asbestos. The decedent was diagnosed with mesothelioma in early 1997, and he died on May 25, 1997.

*Summary of medical reports, depositions, and affidavits*

A medical report, dated January 27, 1997, indicates that the decedent was referred to Dr. M. Jesada because of an abnormal chest x-ray and CAT scan. The report states that the decedent had periodic chest x-rays prior to December 1996, which were normal. As a result of a fall in November 1996, the decedent had various tests. The test included a chest X-ray, which was abnormal, and which was followed by a CAT scan, which was abnormal. According to the report, the decedent advised the physician that he had a history of

asbestos exposure. Dr. Jesada's impression was possible mesothelioma, and a biopsy was recommended.

Records from Harford Memorial Hospital reveal that the decedent was admitted on February 7, 1997, for a biopsy. An oncology report dated February 28, 1997, by Dr. Promila Suri, reflects a diagnosis of probable mesothelioma. The report indicates that the decedent stated that he had a history of exposure to asbestos in the workplace.

A report dated March 4, 1997, by Dr. Viroon Donavanik, indicates that the decedent was admitted to the Medical Center of Delaware on March 4. The report contains a confirmation of a diagnosis of mesothelioma and a recommendation that decedent be treated with radiation and chemotherapy. The report again reveals that the decedent disclosed a history of asbestos exposure while working in a machine shop. The report further noted that decedent worked in the roofing and siding business.

Appellant, in her affidavit, stated that she routinely attended medical appointments with the decedent in the spring of 1997, and neither she nor the decedent was informed of the causal connection between asbestos exposure and mesothelioma. Appellant stated that she first learned of the connection in 2002, when her daughter read an advertisement which referenced the connection and told appellant about it. Appellant testified that she never made any inquiries about the cause of mesothelioma prior to that time.

At the first motions hearing held on November 25, 2003, the court denied appellees' motion for summary judgment without prejudice, stating: "Well ... I think the motion may be premature. And the reason I say that is that Mrs. Benjamin has not been deposed, and I gathered that from reading the papers, and I think that that ought to be done, because I don't want to make a decision in this case based upon an affidavit." Following the hearing, appellant was deposed on December 23, 2003. The pertinent testimony is as follows:

Q. Do you remember your husband telling Dr. Jesada that he had some exposure to asbestos in the past?

A. No.

Q. And you can't pinpoint one way or the other whether you were with your husband on January 27th, 1997 for that exam?

A. I can't remember the date.

\* \* \* \* \* \*

Q. I'm going to show you a report from Dr. Suri dated February 28th, 1997. Do you recall whether you were with your husband on February 28th, 1997 when he went to see Dr. Suri?

A. I was with him almost every time—as far as I know, every time he saw her.

Q. I'm going to show you the report, but there's some reference in the report to your husband being exposed to asbestos when he was a carpenter. Do you remember at any time when you went to see Dr. Suri your husband ever making any mention of the fact that he had been exposed to asbestos while he was working as a carpenter?

A. I do not remember.

\* \* \* \* \* \*

Q. Did there come a time when your husband, as a result of his cancer, went to the Medical Center of Delaware?

A. That's where he got the radiation treatments.

\* \* \* \* \* \*

Q. Did you accompany him to the Medical Center of Delaware—

A. Yes, I did.

Q. —for his radiation?

A. Yes.

Q. And there was one time when you didn't go because of the ice?

A. He went, but I didn't drive him.

Q. Do you know whether you accompanied him on March 4, 1997?

A. I don't know.

Q. I'm going to show you a report dated March 4th, 1997 from Viroon Donavanik.

 \* \* \* \* \* \*

Q. Do you know whether you accompanied your husband on that date to the medical center?

A. I don't know.

Q. And the report, and I've highlighted it, again makes reference to his being exposed to asbestos. Do you know whether during a visit to the Medical Center of Delaware your husband ever told the doctors there that he had been exposed to asbestos?

A. I don't know.

 \* \* \* \* \* \*

Q. Do you remember [the decedent] mentioning to the people at Union Hospital anything about asbestos exposure?

A. No.

Q. Now, you mentioned that you think you were present when Dr. Jesada told your husband that he had lung cancer, correct?

A. I was.

Q. Did your husband ask what caused his lung cancer?

A. No.

 \* \* \* \* \* \*

Q. And you don't recall your husband ever asking Dr. Jesada, hey, what could have caused this cancer?

A. No, I don't.

Q. Did you and your husband ever discuss as between the two of you what possibly could have caused his cancer?

A. No.

 \* \* \* \* \* \*

Q. When you accompanied your husband to see Dr. Suri, do you remember you or your husband ever asking Dr. Suri what may have caused his cancer?

A. Well, it was discussed.

Q. Tell me what was discussed with Dr. Suri regarding the cause of his cancer.

A. I remember her saying she had only had one other case of this type of cancer, it was a woman and she died. Now, that's what I remember of that conversation. We were pretty much upset.

Q. Sure. Any other discussions that you can recall with Dr. Suri by either you or your husband regarding the cause of your husband's cancer?

A. No, I don't remember.

Q. When did you become aware of the name of the cancer that your husband had?

A. Well, I saw it on the death certificate and that might be when.

&ast; &ast; &ast; &ast; &ast; &ast;

Q. Did you have any discussions with any family members as to what may have caused his cancer ... any discussions as to what could have caused it?

A. No.

&ast; &ast; &ast; &ast; &ast; &ast;

Q. Did you ever, subsequent to your husband's death and prior to coming to this law firm, ever ask to see any of your husband's medical records?

A. No.

Q. Did you have in your possession prior to coming to this office any of your husband's medical records?

A. After he died, the VA Hospital, one of my neighbors worked in the X-ray department and he brought the X-rays home and said destroy them. I thought that was unusual, but I did it.

&ast; &ast; &ast; &ast; &ast; &ast;

Q. Other than those X-rays, did you ever have any other medical records relating to your husband's cancer?

A. None.

Significantly, not only is there no evidence that appellant had express knowledge of a causal connection between mesothelioma and asbestos, there is no evidence that appellant had express knowledge that the decedent had been exposed to asbestos during his lifetime or at any time prior to 2002.

Robert L. Benjamin, II, testified in deposition that he had no knowledge of the connection between asbestos exposure and mesothelioma until advised by his sister at "the end of 2001, early 2002." He also testified that he knew the decedent had cancer before death but he did not know it was mesothelioma until his sister told him in late 2001. There is no evidence that Robert L. Benjamin, II had actual knowledge of the decedent's exposure to asbestos prior to late 2001.

There is no evidence that Carol Jeffers had knowledge, until late in the year of 2001, that the decedent was exposed to asbestos or that his cancerous condition was caused by such exposure. According to appellants, this litigation occurred after Carol Jeffers read an article in late 2001 or early 2002 about mesothelioma, told her family, and they contacted counsel.

Appellant also filed an affidavit by John E. Newhagen, Ph.D., dated December 10, 2003. At the time, Dr. Newhagen was an associate professor at the University of Maryland's College of Journalism, and had studied the effectiveness of media communication methods. Dr. Newhagen opined [6] that it would be unlikely for an average consumer to have actual knowledge of the relationship between asbestos exposure and mesothelioma prior to 1997.

We will mention another aspect of the affidavit and its attachment, however, without going into detail. The attachment explains that a search of the *Baltimore Sun'* s archive

---

[6]. Attached to the affidavit as Exhibit 2 was Dr. Newhagen's paper, entitled "The Likelihood of Reading or Viewing Messages Containing Information about the Risk of Mesothelioma to Asbestos Exposure." It provided an analysis of the prevalence of information available in the media concerning the possible link between asbestos exposure and mesothelioma.

from 1990 forward revealed 72 stories discussing mesothelioma. All 72 mentioned a link between asbestos exposure and health risks. The attachment also observes that there is very little archived material available relating to coverage by local television, radio, or local newspapers. The affiant observed, however, that such coverage would tend to follow the agenda set by the *Baltimore Sun,* the dominant daily newspaper in the market. We see no need to summarize the affidavit in greater detail because appellant does not argue that the relationship between asbestos exposure and mesothelioma was not knowable at or prior to May 1997, if a reasonable investigation had been conducted. Appellant's sole argument is that neither she, the other beneficiaries, nor the decedent had sufficient actual knowledge to place them on inquiry notice so as to charge them with the knowledge that a reasonable investigation would have revealed.

## Discussion

### I. *Standard of Review*

 We review an order granting summary judgment *de novo. Beyer v. Morgan State Univ.,* 369 Md. 335, 359, 800 A.2d 707 (2002). Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Maryland Rule 2–501. The purpose of the summary judgment procedure is to allow the court to decide whether there is an issue of fact sufficiently material to be tried, not to try the case or to resolve factual disputes. *Hartford Ins. Co. v. Manor Inn of Bethesda, Inc.,* 335 Md. 135, 144, 642 A.2d 219 (1994). A material fact is a fact that, depending on how it is decided by the trier of fact, will affect the outcome of the case. *Mandl v. Bailey,* 159 Md.App. 64, 82, 858 A.2d 508 (2004) (*citing Arroyo v. Bd. of Educ. of Howard County,* 381 Md. 646, 654, 851 A.2d 576 (2004)).

Thus, an appellate court's review of the grant of summary judgment involves the determination of whether a dispute of material fact exists. *Hartford,* 335 Md. at 144, 642 A.2d 219.

In so doing, we construe the facts properly before the court, and any reasonable inferences that may be drawn from them, in a light most favorable to the non-moving party. *Remsburg v. Montgomery*, 376 Md. 568, 579–80, 831 A.2d 18 (2003) (*citing Todd v. MTA*, 373 Md. 149, 154–55, 816 A.2d 930 (2003)). If the record reveals that there are material facts in dispute, summary judgment is not appropriate. *Horst v. Kraft*, 247 Md. 455, 459, 231 A.2d 674 (1967); *Lawless v. Merrick*, 227 Md. 65, 70, 175 A.2d 27 (1961).

## II. *Analysis*

### A. *Wrongful act*

Preliminarily, before addressing the limitations issues, we shall address the meaning of "wrongful act," as defined in the wrongful death statute. While that issue was not expressly raised by the parties, we address it because we cannot reach a conclusion herein without ascribing a certain meaning to "wrongful act." Thus, we shall expressly address that meaning.

At early common law, negligence actions seeking compensation for personal injuries abated at the death of the injured person, whether the action was pending at the time of death or had not yet been filed. Statutes were enacted in England and in various states, including Maryland. The early statutes, enacted prior to the nineteenth century, addressed actions pending at the time of the injured person's death and provided that such actions, with certain exceptions, would not abate.

In 1888, Maryland first enacted a statute, which not only prevented a pending action from abating, but also empowered the decedent's representative to commence an action subsequent to death. This statute expressly included actions for damages for personal injuries caused by a wrongdoer. This statute was the forerunner to the present survival statute. Md. Code (2001 Repl. Vol.), § 7–401(y) of the Estates & Trusts Article.

Prior to 1852, under the common law, there was no cause of action or recovery "for ... loss suffered by a relative of one

killed by the negligence of another." *McKeon v. State for Use of Conrad,* 211 Md. 437, 442, 127 A.2d 635 (1956). In 1852, however, the legislature, "finding the common-law maxim, '[p]ersonal actions die with the person,' unsuited to the circumstances and condition of the people," *B. & O. R.R. Co. v. Coughlan,* 24 Md. 84, 100 (1866), enacted Ch. 299 of the Acts of 1852, which was "almost a literal transcript of Lord Campbell's act."[7]" *Stewart v. United Electric Light & Power Co.,* 104 Md. 332, 334, 65 A. 49 (1906). The act, entitled "[a]n act to compensate the families of persons killed by the wrongful act, neglect, or default of another person," *B. & O. R.R. Co.,* 24 Md. at 100, gave a right of action "under certain conditions to designated relatives of a deceased person ... when death has been caused by a wrongful act or by negligence." *Stewart,* 104 Md. at 334, 65 A. 49. Maryland's current wrongful death statute was derived from the Acts of 1852.[8]

█ Under the current statute, in order for a beneficiary to maintain an action for wrongful death, there must have been a "wrongful act," defined by Md. Code (1974, 2002 Repl. Vol.), § 3–901(e) of the Courts & Judicial Proceedings Article, as "an act, neglect, or default including a felonious act *which would have entitled the party injured to maintain an action and recover damages if death had not ensued.*" (Emphasis added.)

We interpret the definition as meaning that the decedent must have been able to maintain a compensable action *as of*

---

7. St. 9 & 10 Vict. c. 93 (1846).

8. Aside from changes in language, few changes have been made to the original act which stated in part:

> Whenever the death of a person shall be caused by wrongful act, neglect or default, and the act, neglect or default is such as would (if death had not ensued) have entitled the party injured to maintain an action and recover damages in respect thereof, the person who would have been liable if death had not ensued shall be liable to an action for damages, notwithstanding the death of the person injured, and although the death shall have been caused under such circumstances as amount in law to felony.

> *Stewart,* 104 Md. at 338, 65 A. 49.

*the time of death.* In other words, in order for an act to be wrongful, the decedent must have had a compensable action as of death. The definition does not expressly address the question of the effect on a wrongful death action of any defenses to the decedent's action that arise after death. We reach this conclusion for the following reasons.

First, our reading is consistent with the statutory language, history, and purpose of legislation addressing survival and wrongful death actions. In both instances, the purpose of legislation was and is to provide for compensation following the death of the injured person. The focus was and is on the occurrence of death. The purpose of the survival statute was to prevent a viable action from abating, not to create a nonviable action. The definition of wrongful act in the wrongful death statute is consistent with the survival statute, in that if a defense existed to the decedent's action prior to death, there was no viable action to abate and, similarly, no wrongful act for wrongful death purposes.

Second, we rely on language in prior cases. While we have discovered no case that has expressly addressed the issue before us, *i.e.,* the effect on a wrongful death action of a defense to a survival action that arises after death, Maryland Courts have addressed the effect of a defense that arises before death.

The Court of Appeals has stated "that defenses which would have been good against the decedent, had the decedent survived, are good against the decedent's personal representative and, in their capacity as Lord Campbell's Act claimants, the decedent's survivors." *Smith v. Gross,* 319 Md. 138, 144, 571 A.2d 1219 (1990). The wrongful act definition has been held to prevent post-death actions in cases of contributory negligence, *see McQuay v. Schertle,* 126 Md.App. 556, 730 A.2d 714 (1999) (holding that, if the decedent had been contributorily negligent, the right of her children to recover for her wrongful death would for that reason have been barred); assumption of the risk, *see Baltimore & Potomac R.R. v. State, to Use of Abbott,* 75 Md. 152, 23 A. 310 (1892); under family immunity

doctrines, *see Smith v. Gross,* 319 Md. 138, 571 A.2d 1219 (1990) (holding that a wrongful death action brought by the mother for the death of her son caused by the negligence of father was barred because a suit by the son, had he survived, would have been barred by parent-child immunity); and prior release or adjudication of a claim. *State v. United Railways and Electric Company of Baltimore,* 121 Md. 457, 88 A. 229 (1913). The language in those cases consistently refers to defenses existing at the time of death. *See also Dehn v. Edgecombe,* 152 Md.App. 657, 696, 834 A.2d 146 (2003) ("if a decedent could not have brought a cause of action for injury *at the time of death,* the wrongful death action similarly is precluded").

*Binnix v. Johns–Manville Products Corp.,* 593 F.Supp. 1180, 1183 (D.Md.1984) (applying Maryland law) is also instructive. In that case, the defendants argued that the wrongful death action was barred by limitations because the action accrued when the decedent was diagnosed with cancer and the action was filed more than three years after that date. The Court held that the wrongful death action did not accrue until death, but also observed that the fact that the survival action may have been barred by limitations that ran after death did not bar the wrongful death action. Conversely, in *Mills v. International Harvester Co.,* 554 F.Supp. 611 (D.Md.1982) (applying Maryland law), the Court recognized that when the decedent's cause of action is time barred at the time of death, the family's wrongful death cause of action does not arise. It does not arise because there was no wrongful act.

██ Although we recognize that these cases are not on point with respect to the facts before us, the language is consistent with our conclusion that, in order for a limitations defense to a survival action to bar a cause of action for wrongful death, the applicable limitations period must expire before the decedent's death.

██ Applying these principles to the present case, we conclude that, had the decedent lived, he would have been able to bring a personal injury action within 3 years after accrual of

his cause of action. If the statute of limitations had run on the decedent's claim before he died, it would have acted as a defense to the beneficiaries' claim. The decedent discovered his cause of action in early 1997 and died in May of the same year. Therefore, the decedent would have "been able to maintain a cause of action if death had not ensued" because, *at the time of his death,* the statute of limitations had not yet run on his claim. Consequently, the definition of wrongful act does not preclude the wrongful death claim by the beneficiaries.

### B. *The applicable limitations statutes*

The decedent's mesothelioma was an occupational disease. *See* Md. Code (1974, 2002 Repl. Vol.), § 5–113(a) and § 3–904(g)(2)(i) of the Courts & Judicial Proceedings Article ("C.J.") (occupational disease means a disease caused by exposure to any toxic substance in a place of employment and contracted during the course of employment). Thus, whether the survival action was timely filed is governed by C.J. § 5–113(b), which provides:

> An action for damages arising out of an occupational disease shall be filed within 3 years of the discovery of facts from which it was known or reasonably should have been known that an occupational disease was the proximate cause of death, but in any event not later than 10 years from the date of death.

The timeliness of the wrongful death action is governed by C.J. § 3–904(g)(2)(ii), which provides:

> If an occupational disease was a cause of a person's death, an action shall be filed:
> 1. within 10 years of the time of death, or
> 2. within 3 years of the date when the cause of death was discovered, whichever is the shorter.

### C. *The discovery rule*

■■ The question in this case is when appellant's causes of action against the manufacturers of asbestos containing

products accrued. Usually, when a cause of action accrues is a legal question for the court, unless it turns on the resolution of disputed facts. *Moreland v. Aetna U.S. Healthcare, Inc.,* 152 Md.App. 288, 296, 831 A.2d 1091 (2003). In tort actions, the general rule is that a cause of action accrues at the time of the wrong. Various exceptions to this rule have been recognized, the notable one in this case being the discovery rule.

The discovery rule was first recognized in a medical malpractice case. *See Hahn v. Claybrook,* 130 Md. 179, 100 A. 83 (1917). There, the Court held that the cause of action was barred by limitations, but recognized that the cause of action did not accrue until an injury was discoverable. By 1981, the discovery rule was fully developed, and in *Poffenberger v. Risser,* 290 Md. 631, 431 A.2d 677 (1981), the Court extended its application to all torts. In *Poffenberger,* the Court, discussing the nature of the knowledge necessary for a cause of action to accrue, stated:

> This issue posed by builder Risser causes us to focus on the nature of the knowledge necessary, under the discovery rule, to start the running of the limitations period. With respect to the acquisition of knowledge, Judge McSherry in speaking for this Court nearly a century ago said:
>
>> Notice is of two kinds—actual and constructive. Actual notice may be either express or implied. If the one, it is established by direct evidence, if the other by the proof of circumstances from which it is inferable as a fact. Constructive notice is, on the other hand always a presumption of law. Express notice embraces not only knowledge, but also that which is communicated by direct information, either written or oral, from those who are cognizant of the fact communicated. Implied notice, which is equally actual notice, arises where the party to be charged is shown to have had knowledge of such facts and circumstances as would lead him, by the exercise of due diligence, to a knowledge of the principal fact .... It is simply circumstantial evidence from which notice may be inferred. It differs from constructive notice, with which it is frequently confounded, and which it greatly

resembles, in respect to the character of the inference upon which it rests; constructive notice being the creature of the positive law, resting upon strictly legal presumptions which are not allowed to be controverted, whilst implied notice arises from inference of *fact.* [*Baltimore v. Whittington,* 78 Md. 231, 235–36, 27 A. 984, 985 (1893). (Authorities omitted).]

As the knowledge imputed by the just defined constructive notice, if deemed to be sufficient to activate the running of limitations, would recreate the very inequity the discovery rule was designed to eradicate, we now hold this type of exposure does not constitute the requisite knowledge within the meaning of the rule. Affirmatively speaking, we determine the discovery rule contemplates actual knowledge that is express cognition, or awareness implied from

> knowledge of circumstances which ought to have put a person of ordinary prudence on inquiry [thus charging the individual] with notice of all facts which such an investigation would in all probability have disclosed if it had been properly pursued. *Baynard v. Norris,* 5 Gill. 468, 483, 46 Am.Dec. 647; *Higgins v. Lodge,* 68 Md. 229, 235, 11 A. 846, 6 Am. St. Rep. 437. In other words, a purchaser cannot fail to investigate when the propriety of the investigation is naturally suggested by circumstances known to him; and if he neglects to make such inquiry, he will be held guilty of bad faith and must suffer from his neglect. [*Fertitta v. Bay Shore Dev. Corp.,* 252 Md. 393, 402, 250 A.2d 69, 75 (1969), quoting *Blondell v. Turover,* 195 Md. 251, 257, 72 A.2d 697, 699 (1950).]

*Id.* at 636–638, 431 A.2d 677.

 In short, constructive knowledge, based on legal presumptions, will not suffice. Actual knowledge may be express, based on direct evidence, or implied, based on circumstantial evidence. Putting aside, for the moment, any discussion of who comes within the term "claimant," as used in this sentence, application of the discovery rule involves two subquestions: (1) the sufficiency of the actual knowledge to put

the claimant on inquiry notice, and (2) if put on inquiry notice, the sufficiency of the knowledge that would have resulted from a reasonable investigation, *i.e.*, the extent of information that was knowable.

In product liability actions, at least such actions that do not involve a latent disease, if not in all personal injury tort actions, the case law appears to provide a reasonably clear answer to the second question. The answer, as discussed below, is that a reasonably diligent inquiry must disclose probable manufacturing wrongdoing or product defect that probably caused the injury. *Pennwalt Corp. v. Nasios*, 314 Md. 433, 550 A.2d 1155 (1988). In the case before us, the question is the *nature and extent of actual knowledge necessary to cause an inquiry to be made, i.e., the first prong of the discovery rule.* Appellant acknowledges that if there was sufficient actual knowledge to cause inquiry, a reasonably diligent inquiry would have disclosed a causal connection between mesothelioma and asbestos exposure and probable manufacturing wrongdoing, thus satisfying the second prong.

### 1. *Product liability cases: non-latent disease*

In *Lutheran Hospital v. Levy*, 60 Md.App. 227, 482 A.2d 23 (1984), the plaintiff was treated for a broken ankle. Subsequently, a physician told the plaintiff the ankle was "messed up" and asked her who told her to walk on it. The court applied the first prong of the discovery analysis and held, as a matter of law, that the plaintiff was on inquiry notice when she was advised her ankle was "messed up." At that time, she was required to conduct an investigation to determine if she had a tort claim against her treating physician, and she was charged with the information that would have been disclosed by such an investigation.

In *Baysinger v. Schmid Prod. Co.*, 307 Md. 361, 514 A.2d 1 (1986), a case relied on by appellant, the plaintiff had an intrauterine device inserted and then removed when she experienced problems. In 1979, the plaintiff questioned her physicians as to whether the device had caused her problems. The

physicians stated they could not connect it. Four years later, the plaintiff obtained information linking the device with her illness and filed suit.

Appellant relies on *Baysinger* for the proposition that the Court held that the plaintiff was not on inquiry notice as a matter of law and argues that the decedent and she had even less notice than the plaintiff in *Baysinger.* We disagree. *Baysinger* was actually decided under the second prong of the discovery rule. The *Baysinger* plaintiff, in fact, conducted an inquiry. The Court held that it was a fact question as to what a reasonable investigation would have disclosed. The basis for the holding was that the plaintiff's inquiry resulted in her being advised that the device could not be related to her injury; thus, she did not suspect any wrongdoing at that time, and a reasonable inquiry would not necessarily have resulted in knowledge of causal connection and wrongdoing.

In *Pennwalt, supra,* the Court answered a certified question from the United States District Court for the District of Maryland. The question arose out of a medical products liability action in which the plaintiff, who had received an anesthetic, sued the manufacturer of the anesthetic. The question, as posed by the District Court, was whether, under the discovery rule, knowledge of the manufacturer's wrongdoing or product defect was required, in addition to knowledge of possible causation, to trigger the statute of limitations. The Court of Appeals stated that the cause of action accrued when the plaintiff knew or should have known of probable manufacturing wrongdoing or product defect, which probably caused an injury. The Court explained that this required actual knowledge, express or implied, but the explanation related to the second prong of the discovery rule, *i.e.,* the nature and extent of the information that must be knowable. With respect to the first prong, the Court stated only that an investigation should be pursued when a person is aware of facts sufficient to cause a reasonable person to investigate. The case does not describe how to determine the sufficiency of the actual knowledge to cause a reasonable person to investigate, *i.e.,* put a claimant on inquiry notice.

### 2. Latent disease cases

*Harig v. Johns–Manville Products Corp.*, 284 Md. 70, 394 A.2d 299 (1978), decided before *Poffenberger*, involved a living plaintiff with a latent disease, specifically, mesothelioma. The Court answered a question certified by the United States District Court for the District of Maryland. The Court advised that the cause of action accrued when the plaintiff discovered or should have discovered the "nature and cause of his injury." Again, the Court did not discuss how to determine the sufficiency of knowledge necessary for inquiry notice and, specifically, whether knowledge of the existence of mesothelioma was sufficient, or whether something more was required.

In 1983, the Court decided *Pierce v. Johns–Manville Sales Corp.*, 296 Md. 656, 464 A.2d 1020 (1983). In that case, the plaintiff contracted asbestosis on of before early 1970. Several years later, the plaintiff contracted lung cancer. The Court held that asbestosis and lung cancer were two different diseases, and the cause of action for lung cancer did not accrue until the plaintiff knew or should have known he had lung cancer. Again, inquiry notice was not the issue, and the case is not dispositive with respect to whether knowledge of lung cancer, standing alone, would be sufficient to cause inquiry. The decision in *Smith v. Bethlehem Steel*, 303 Md. 213, 492 A.2d 1286 (1985), is similar to *Pierce*, except that the plaintiff was diagnosed with colon cancer following a diagnosis of asbestosis.

### 3. Latent disease: death

In *Trimper v. Porter–Hayden*, 305 Md. 31, 501 A.2d 446 (1985), the plaintiff died from asbestos related diseases. Under the then existing wrongful death statute, later amended, the Court held that the discovery rule did not apply to wrongful death actions. Under the then existing general statute of limitations, prior to enactment of section 5–113(b), the occupational disease provision quoted above, the Court applied the discovery rule to the survival action, in part, and held that the cause of action accrued when the "injured"

person knew or should have known "the nature and cause" of the injury or at death, whichever first occurred. *Id.* at 52, 501 A.2d 446.

*Trimper* makes it clear that the limitations/repose provision in the wrongful death statute governs wrongful death actions, and the general statute of limitations governs survival actions. 305 Md. at 34, 501 A.2d 446.[9] Again, *Trimper* discusses the second prong of the discovery rule and indicates that the knowledge that a reasonable investigation would disclose is probably not sufficient if it would show only injury. A reasonable investigation must disclose something to indicate that there is a cause of action. Also as mentioned previously, this is not the determinative issue in the case before us because appellant made no inquiry whatsoever and a reasonable inquiry, had one been made, clearly would have disclosed a causal connection and cause of action. The issue in the present case is whether the actual knowledge shown is sufficient for inquiry notice purposes.

The legislature reacted to the *Trimper* decision, and in 1986, it enacted section 3–904(g)(2), *supra*. 1986 Laws of Maryland chapter 374. In 1987, the 5–year period that was in the original enactment was changed to the current 10 years. 1987 Laws of Maryland, chapter 629. Also in 1987, the legislature enacted section 5–113, *supra*. 1987 Laws of Maryland, chapter 624. In 1988, the enactment was amended to add § (c), defining proximate cause. While the language in the two limitations/repose provisions is not the same, *i.e.*, section 5–113(b) provides that a claim has to be "filed within 3 years of the discovery of facts from which it was *known or reasonably should have been known* that an occupational disease was the proximate cause of death," and section 3–904(g)(2)(ii)(2) provides that a claim has to be filed "[w]ithin 3 years of the date when the cause of death *was discovered*," we conclude that, in each instance, the legislature incorporated

---

9. Stated more properly, the provision in section 3–904(g) is a condition precedent to suit, not a statute of limitations. *Waddell v. Kirkpatrick*, 331 Md. 52, 57, 626 A.2d 353 (1993).

the discovery rule as judicially developed. We have not had occasion to interpret the statutes in question before, but we have interpreted analogous statutes.

In Workers' Compensation law, the statute of limitations applicable to occupational disease claims differs from that applicable to accidental injuries. The occupational disease provision provides, in pertinent part, that a claim has to be filed within 3 years after the date the employee "had actual knowledge that the disablement was caused by the employment." Md. Code (1991, 1999 Repl. Vol., 2004 Supp.), § 9–711 of the Labor and Employment Article. In *Tru–Rol Co. Inc. v. Yox*, 149 Md.App. 707, 818 A.2d 283 (2003), we applied the inquiry notice rule in that context. *Id.* at 719–720, 818 A.2d 283 (when claimant consulted physician and was told he needed a hearing aid and claimant indicated he thought hearing problems were related to employment, claimant was on inquiry notice and required to conduct a reasonable investigation).

In medical malpractice cases, limitations/repose is governed by C.J. § 5–109. That section provides:

**Suits against health care providers**

(a) An action for damages for an injury arising out of the rendering or failure to render professional services by a health care provider . . . shall be filed within the earlier of:

(1) Five years of the time the injury was committed; or

(2) Three years of the date the injury *was discovered.*

(Emphasis added.)

While application of the statute turns on "injury" and not "death," both statutes are similar in that they contain the phrase "was discovered." As discussed above, the judicially developed discovery rule has long been applicable to claims for medical malpractice. In *Jacobs v. Flynn*, 131 Md.App. 342, 361, 749 A.2d 174 (2000), we applied the language of section 5–109 in a medical malpractice case, concluding that

[a] claimant will be charged with notice, and the statute will begin to run when:

knowledge of circumstances which ought to have put a person of ordinary prudence on inquiry [thus, charging the individual] with notice of all facts which such an investigation would in all probability have disclosed if it had been properly pursued. (citations omitted).

This aspect of limitations law is known as the discovery rule. (citations omitted). It applies in medical malpractice actions as well as other negligence suits. (citations omitted).

*Id. See also Piselli v. 75th Street Medical,* 371 Md. 188, 203, 808 A.2d 508 (2002) ("[W]e fully agree with the United States Court of Appeals for the Fourth Circuit that the unambiguous language of § 5–109(a)(2) does embody the traditional Maryland 'discovery rule' as set forth in our cases.") (citations omitted); *Edmonds v. Cytology Services of Maryland, Inc.,* 111 Md.App. 233, 244, 681 A.2d 546 (1996), *aff'd sub nom, Rivera v. Edmonds,* 347 Md. 208, 699 A.2d 1194 (1997) ("We have interpreted C.J. § 5–109(a)(2) to provide the plaintiff with three years from the date the wrong was discovered or *reasonably should have been discovered.*") (citations omitted) (emphasis added).

Thus, in the absence of any other applicable language in the statute, and with the longstanding application of the discovery rule to medical malpractice claims, we interpreted the phrase "was discovered," in section 5–109, to mean the judicially developed discovery rule. By analogy, therefore, we interpret identical language in the wrongful death statute as having incorporated the discovery rule.

### D. *The present case*

The court, in its opinion and order dated June 17, 2004, reasoned that

the fact that a plaintiff tells his physicians that he was exposed to asbestos when diagnosed with mesothelioma is prima facie evidence for plaintiffs to be on inquiry notice. When a patient volunteers information about his condition there can be no explanation other than he believes it is significant. The proffered facts may or may not be relevant to the patient's disease—but he has a duty to investigate.

Here, Plaintiffs knew Mr. Benjamin was diagnosed with mesothelioma; they knew Mr. Benjamin was exposed to asbestos; they conveyed this information to his various doctors during the course of his treatment; and yet they chose to do nothing with this information.

It is not clear whether the court imputed or otherwise attributed the decedent's knowledge to all plaintiffs or whether the court believed that the decedent's actual knowledge and the plaintiffs' actual knowledge were the same or, in each case, factually sufficient. In any event, in determining whether summary judgment was appropriate as to all claims, it is essential to take into account that the wrongful death action and the survival action are two distinct causes of action, each with a different plaintiff(s). Thus, the identity of the claimant must be taken into account when assessing the knowledge required for inquiry notice.

### 1. *Whose knowledge is determinative?*

Although the governing statutes are written in the passive voice, and do not identify who must discover, or who knew or should have known of, the existence of the cause of action such that the inquiry notice prong has been satisfied, case law in Maryland regarding wrongful death actions, survival actions, and medical malpractice actions speak generally in terms of a "claimant," an "injured" person, or a "plaintiff." *See, e.g., Eagan v. Calhoun,* 347 Md. 72, 82, 698 A.2d 1097 (1997) ("It follows from the fact that the action is a personal one to the claimant that the claimant is ordinarily subject to any defense that is applicable to him or her, whether or not it would have been applicable to the decedent."); *Geisz v. Greater Baltimore Medical Center,* 313 Md. 301, 307, 545 A.2d 658 (1988) ("[Plaintiff] contends that she did not 'discover' the causes of action until she read a newspaper article describing one or more malpractice actions filed against [the defendant] and that discovery is the sole manner in which this survival claim can accrue."); *Trimper v. Porter–Hayden,* 305 Md. 31, 52, 501 A.2d 446 (1985) ("[I]n situations involving the latent development of disease, any cause of action of the injured person

accrues either (1) when he ascertains, or through the exercise of reasonable care and diligence should have ascertained, the nature and cause of his injury. . . ."); *Young v. Medlantic Laboratory Partnership,* 125 Md.App. 299, 306, 725 A.2d 572 (1999)("Under the discovery rule, a cause of action *accrues* (thereby triggering the limitations period) when the patient discovers or should have discovered, that he or she has a cause of action."); *Calhoun v. Eagan,* 111 Md.App. 362, 385, 681 A.2d 609 (1996), *vacated on other grounds,* 347 Md. 72, 698 A.2d 1097 (1997) ("Thus, even though a plaintiff in a wrongful death action depends, in part, on the rights that the decedent would have had, the wrongful death action is a personal suit against the defendant to recover for the claimant's own injuries.").

We conclude the following. First, in an action by a living injured plaintiff, the injured plaintiff is the determinative person.

Second, in the event of death and a subsequent survival action, both the decedent and the personal representative are the determinative persons. A survival action is brought by the personal representative on behalf of the decedent. Thus, if the decedent's knowledge is sufficient for inquiry notice, and the second prong of the discovery rule is satisfied as well, the decedent is the determinative person. If the decedent does not have knowledge sufficient to satisfy the discovery rule, the personal representative is the determinative party and must be on inquiry notice for the cause of action to accrue.

Third, in a wrongful death action, if the decedent does not have knowledge to satisfy the discovery rule, the beneficiaries are the determinative parties. In other words, in that situation, the cause of action does not accrue until the beneficiaries are on inquiry notice. In a wrongful death action, the decedent's knowledge is not imputed or otherwise charged to the beneficiary claimants. We reach this result because of the difference between a survival action and a wrongful death action.

## 2. *Two causes of action*

In *Globe American Casualty Company v. Chung,* 76 Md. App. 524, 547 A.2d 654 (1988), *vacated on other grounds,* 322 Md. 713, 589 A.2d 956 (1991), Judge Moylan explained that survival and wrongful death actions are two separate and distinct claims:

When a victim dies because of the tortious conduct of someone else, two entirely different types of claim may arise. One is a survival action commenced or continued by the personal representative of the deceased victim, seeking recovery for the injuries suffered by the victim and prosecuted just as if the victim were still alive. It is called a 'survival action' in the sense that the claim has survived the death of the claimant. The other is a wrongful death action, brought by the relatives of the victim and seeking recovery for their loss by virtue of the victim's death. A deceptive similarity inevitably results from the prominent common denominator fact that the victim has died. In other essential characteristics, however, the two types of claim are clearly distinct. The first arises from the tortious infliction of injury upon the victim; the second, only from the actual death of the victim. In the first, damages are measured in terms of *harm to the victim;* in the second, damages are measured in terms of *harm to others* from the loss of the victim. In the first, the personal representative serves as the posthumous agent of the victim; in the second, his surviving relatives do not serve as his agent at all. They act in their own behalf.

*Id.* at 526–27, 547 A.2d 654; *see Stewart v. United Electric Light & Power Co.,* 104 Md. 332, 65 A. 49 (1906).

The Court continued:

In a survival action, in contrast to a wrongful death action, the death of the claimant [the decedent] need not have been as a result of the tortious injury but may have stemmed from a completely independent cause.

\* \* \* \* \* \*

Unlike a survival action, a wrongful death action arose not from the injury but from the death of the injured party. *Id.* at 535, 547 A.2d 654; *see Stewart*, 104 Md. 332, 65 A. 49 (1906).

 This rule makes it clear that a survival action is the decedent's cause of action brought on his behalf after his death. In other words, in a survival action, the decedent is the claimant, and the personal representative merely his agent.

 For a survival action to lie, there is no requirement that the injuries sustained by the decedent be the cause of death, thus, death is irrelevant to the cause of action. *Id.* This means that, even though the action is brought after death, a survival action may accrue before the decedent dies because the claim arises out of personal injuries sustained by the decedent during his lifetime. As such, the knowledge of the decedent must govern inquiry notice. As stated previously, when the decedent does not know of the cause of his injury before death, the cause of action does not accrue until the personal representative, standing in the shoes of the decedent, is on inquiry notice. This analysis comports with the holding in *Trimper*, where the Court stated:

> [I]n situations involving the latent development of disease, *any cause of action of the injured person accrues either* (1) when *he ascertains, or through the exercise of reasonable care and diligence should have ascertained, the nature and cause of his injury,* or (2) at death, whichever first occurs.

*Trimper*, 305 Md. at 52, 501 A.2d 446 (emphasis added).

Here, the "injured person" is the decedent, and any cause of action the decedent may have, including a survival action, accrues when the discovery rule is satisfied during his lifetime. Thus, because of the nature of a survival action, knowledge obtained by the decedent during his lifetime can act to cut short the decedent's cause of action after death.

 Conversely, in a wrongful death action, death is essential to the cause of action. *Globe American*, 76 Md.App.

at 534, 547 A.2d 654. The claim for damages is by the beneficiaries on their own behalf for damages sustained by them due to, and following, the decedent's death. Thus, the beneficiaries are the claimants, and it is their knowledge that must trigger inquiry notice.

Applying the principles set forth above, we shall now turn to the issues in the present case.

### 3. *Survival action*

■ The discovery rule, including the inquiry notice prong, has to be considered and applied in the context of the facts of a particular case. In some instances, the discovery rule may apply as a matter of law, and in other instances, it may present a fact question. In the case before us, we hold that the decedent's express knowledge that he had been diagnosed with mesothelioma and his express knowledge of his workplace exposure to asbestos, discussed with his physicians, is sufficient, as a matter of law, to have placed the decedent on inquiry notice during his lifetime. It is not necessary to show express knowledge of a causal relationship between mesothelioma and asbestos exposure or manufacturing wrongdoing to satisfy the first prong of the discovery rule. We reach this decision because, based on the state of general knowledge of occupational diseases and asbestos exposure in 1997, a reasonable person with the decedent's actual knowledge would have conducted an inquiry.

■ The second prong is not at issue, but as previously stated, a reasonable investigation would have disclosed a causal connection and possible causes of action. The relationship between asbestos exposure and mesothelioma has been reported for many years. All of the facts necessary to make a claim were in existence at the time of the diagnosis of mesothelioma, and a reasonable inquiry would have disclosed a cause of action.

Thus, the personal representative's cause of action under the survival statute is barred by limitations.

#### 4. *Wrongful death*

In a footnote, the court stated, "[t]he Court notes that the record contains an affidavit and testimony of Mrs. Benjamin, alleging that she accompanied her husband on all his hospital and doctor visits." While it is not clear, it may be that the court concluded that accompanying the decedent on visits to health care providers was sufficient to imply knowledge to appellant that the decedent was exposed to asbestos. We cannot reach that conclusion as a matter of law.

Although we conclude that the decedent was aware of his asbestos exposure and that he had mesothelioma, and that this was sufficient to put *him* on inquiry notice prior to his death and bar a survival action on his behalf, it is not dispositive of the limitations issue as to *appellants'* claim for wrongful death. To reiterate, wrongful death and survival actions are two separate and distinct causes of action with two separate and distinct claimants. Thus, disposing of one does not automatically act as a bar to the other.

 Although appellant and the other beneficiaries had express knowledge, no later than 1997, that the decedent's death was due to mesothelioma, we hold that that knowledge alone is insufficient, as a matter of law, to constitute inquiry notice. There is no evidence that appellant or the other beneficiaries had express knowledge of the decedent's asbestos exposure prior to late 2001. We reach this conclusion because, in our view, the knowledge must be such as to prompt a reasonable person to inquire as to a possible connection between the injury and causative factors. While knowledge of injury or disease alone may be sufficient, as a matter of law, to satisfy inquiry notice, ordinarily it is not sufficient.

 The direct evidence of express knowledge in the case before us is that appellant and the other beneficiaries knew only that the cause of death was mesothelioma, prior to late 2001. As stated above, in a motion for summary judgment, the non-moving party, here appellant, gets the benefit of all reasonable inferences. Consequently, we are unwilling to infer, as a matter of law, that appellant knew the decedent was

exposed to asbestos based on her relationship with the decedent and having accompanied the decedent to health care providers. Similarly, we are unwilling to infer that appellant had any knowledge as to the nature of mesothelioma other than that it was a form of cancer. Whether such an inference(s) should be drawn, *i.e.*, whether appellant impliedly had such knowledge, or other knowledge, is a question for the fact finder. If the fact finder were to conclude that appellant had such knowledge sometime prior to 2001, either by drawing a reasonable inference from the testimony as we know it, or by resolving a credibility determination against appellant as to what she knew when, the cause of action accrued as of that time. Thus, because knowledge of mesothelioma alone is insufficient for inquiry notice, and on the record before us, it is a fact question as to whether and when appellant also had knowledge of decedent's asbestos exposure, summary disposition of the wrongful death claim was inappropriate.

 The wrongful death action was brought on behalf of three beneficiaries. Only one action lies for wrongful death, C.J. § 3–904(f), and damages are divided among the beneficiaries. C.J. § 3–904(c). All persons who are or may be entitled by law to damages shall be named as plaintiffs, whether or not they join in the action. Md. Rule 15–1001(b). In the present case, there is no evidence that the children of the decedent were on inquiry notice any earlier than appellant. At trial, however, the fact finder might resolve the factual issue of notice differently as to each claimant. For the benefit of the court on remand, we express our view that the knowledge of each claimant is determinative as to that claimant. The knowledge of one claimant is not imputed to the other claimants.

**JUDGMENT AFFIRMED IN PART AND REVERSED IN PART. CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR FURTHER PROCEEDINGS. COSTS TO BE PAID ONE–HALF BY APPELLANT AND ONE–HALF BY APPELLEES.**