927 A.2d 426

**STATE of Maryland, et al.**

v.

**Corethia COPES, Individually, etc.**

**No. 1063, Sept. Term, 2006.**

Court of Special Appeals of Maryland.

July 5, 2007.

354

Roger K. Picker (J. Joseph Curran, J., Attorney General on the brief), for appellant.

W. Charles Meltmar, Washington, DC, for Appellee.

Panel HOLLANDER, EYLER, DEBORAH S., KENNEY, JAMES A., III (Ret'd, Specially Assigned), JJ.

EYLER, DEBORAH S., J.

On July 12, 2003, Gladys Copes, age 63, died while a patient at the Deer's Head Hospital Center (the "Center"), in Salisbury. The Center is a State-operated long-term nursing facility. Gladys had had several admissions to the Center in the months immediately preceding her death.

Corethia, Christal, and Chantel Copes are Gladys's adult children, and her only living children.[1] Corethia is a resident of Salisbury; Christal and Chantel live in Virginia. Corethia was named personal representative under her mother's will. At the time of her death, Gladys was not married.

On July 2, 2004, Corethia's attorney notified the State Treasurer, in writing, that Gladys's death was the result of medical malpractice by health care providers at the Center.

On November 3, 2004, in the Circuit Court for Wicomico County, Corethia, individually and as the personal representative of Gladys's estate, sued the "State of Maryland d/b/a Deer's Head Center" for medical malpractice in one negligence count. She prayed a jury trial. Corethia alleged that Gladys died from a virulent E. coli infection that developed at the site of an ulcer on her leg, and that the ulcer developed because the Center's health care providers incorrectly applied a cast to her leg. She further alleged that the Center health care providers subsequently failed to properly diagnose and treat the infection.

Corethia amended her complaint to divide her claim into two counts, one for survival and one for wrongful death. She subsequently amended her complaint again to name Christal and Chantel as "use plaintiffs." Ultimately, she again amended her complaint to join her sisters as plaintiffs.

The State moved for summary judgment on both counts, arguing that the survival action was barred by sovereign immunity because Corethia did not give timely notice of claim to the State Treasurer as required by the Maryland Tort Claims Act ("MTCA"), Md.Code (2004 Repl.Vol., 2006 Supp.), section 12–101, *et seq.* of the State Government Article ("SG"); that Christal and Chantel's wrongful death claims also were barred by sovereign immunity because they did not give any notice of claim to the State Treasurer; and that, even though Corethia herself had properly notified the State Treasurer of

---

1. We shall refer to the individual parties by their first names, for ease of discussion.

her wrongful death claim, she could not pursue it, because either all three of the wrongful death beneficiaries could recover for wrongful death or none of them could.

The circuit court granted summary judgment in favor of the State on the survival action and the wrongful death claims of Christal and Chantel, leaving only Corethia's wrongful death claim. That claim was tried to a jury that found in her favor, awarding $175,000 in damages.

The State noted an appeal and Corethia, on her own behalf and on behalf of her sisters, noted a cross-appeal. The State has raised one question and the appellees have raised two. Because the answer to the State's question depends upon the answers to the appellees' questions, we shall reorder them as follows:

***By the appellees:***

I. Did the circuit court err by granting summary judgment in favor of the State on the survival claim?

II. Did the circuit court err by granting summary judgment in favor of the State on Christal and Chantel's wrongful death claims?

***By the State:***

III. Did the circuit court err by denying its summary judgment motion as to Corethia's wrongful death claim?

For the following reasons, we shall affirm the judgment in part, reverse the judgment in part, vacate the judgment in part, and remand the case to the circuit court for further proceedings not inconsistent with this opinion.

## SOVEREIGN IMMUNITY/MTCA

█ The State of Maryland, as sovereign, has absolute immunity from suit under common law. That immunity exists unless the State waives it and creates a means to fund the payment of judgments against it. *Stern v. Bd. of Regents,* 380 Md. 691, 700–01, 846 A.2d 996 (2004). By enactment of the

MTCA in 1981, the State, with certain conditions and limitations, did just that.

SG section 12–104(a)(1) provides that, "[s]ubject to the exclusions and limitations in this subtitle and notwithstanding any other provision of law, the immunity of the State and of its units is waived as to a tort action, in a court of the State, to the extent provided under paragraph (2)[.]" Paragraph two limits the liability of the State in a tort action to "$200,000 to a single claimant for injuries arising from a single incident or occurrence." SG § 12–104(a)(2). (The section goes on to create certain exceptions to that limitation, which are not at issue here.) SG section 12–105 confers immunity from suit upon State personnel, for certain wrongs, including negligence.

To sue the State under the MTCA, a claimant first must satisfy the claim requirements of SG sections 12–106 and 12–107. SG section 12–106, entitled "Restrictions on actions[,]" describes the written claim that must be submitted as a condition precedent to the State's waiver of immunity in tort. It states:

(a) *Scope of Section.*—This section does not apply to a claim that is asserted by cross-claim, counterclaim, or third-party claim.

(b) *Claim and denial required.*—A claimant may not institute an action under this subtitle unless:

(1) the claimant submits a written claim to the Treasurer or a designee of the Treasurer within 1 year after the injury to person or property that is the basis of the claim;

(2) the Treasurer or designee denies the claim finally; and

(3) the action is filed within 3 years after the cause of action arises.

SG § 12–106 (emphasis added).

SG section 12–107(a) specifies the information that must be included in the written claim. It directs that the claim shall:

(1) contain a concise statement of facts that sets forth the nature of the claim, including the date and place of the alleged tort;

(2) demand specific damages;

(3) state the name and address of each party;

(4) state the name, address, and telephone number of counsel for the claimant, if any; and

(5) be signed by the claimant, or the legal representative or counsel for the claimant.

SG § 12–107(a).

Finally, pursuant to SG section 12–102, the MTCA "shall be construed broadly, to ensure that injured parties have a remedy."

## STANDARD OF REVIEW

In reviewing a decision by a circuit court to grant summary judgment, "[w]e consider, *de novo*, first, whether a material fact was placed in genuine dispute, thus requiring a trial, and, second, if trial by a fact-finder is not required, whether the [c]ircuit [c]ourt was legally correct in granting summary judgment." *Haas v. Lockheed Martin Corp.*, 396 Md. 469, 478, 914 A.2d 735 (2007) (citing *Livesay v. Baltimore County*, 384 Md. 1, 9, 862 A.2d 33 (2004)). We conduct an independent review of the summary judgment record and "construe the facts properly before the court, and any reasonable inferences that may be drawn from them, in the light most favorable to the non-moving party." *Remsburg v. Montgomery*, 376 Md. 568, 579–80, 831 A.2d 18 (2003) (citing *Todd v. MTA*, 373 Md. 149, 155, 816 A.2d 930 (2003)).

## DISCUSSION

### I.

### The Survival Action

The State moved for summary judgment on the survival action on the ground that Corethia's claim, as personal repre-

sentative, was not submitted to the State Treasurer "within 1 year after the injury to the person . . . that is the basis for the claim," as required by SG section 12–106(b)(1). Specifically, according to the State, Gladys's "injury," within the meaning of the MTCA, occurred no later than June 2, 2003; yet Corethia, as personal representative, submitted the written claim to the State Treasurer on July 2, 2004, more than one year later.[2]

Corethia filed an opposition to the summary judgment motion. She did not argue that there was any genuine dispute of material fact that would preclude the entry of summary judgment. Rather, she argued that "the injury to Gladys [ ] occurred on July 12, 2003, the day she died"; and that, because "[c]ase law in Maryland clearly establishe[s] that the date of injury, not the date of negligence, is the date from which the one year notice requirement starts[,]" the claim was timely submitted on July 2, 2004, less than one year after the date of death.[3]

The circuit court granted summary judgment in favor of the State on the survival claim on the ground that Corethia's written claim was not timely submitted under SG section 12–106(b)(1).

### Facts Material to the Survival Action

The undisputed material facts before the court on summary judgment, viewed in the light most favorable to Corethia as

---

2. The State attached the following exhibits as relevant to the survival action: 1) the Center's discharge summary detailing Gladys' care during her first admission, a document entitled, "Admission History & Physical" completed during her second admission, and her death summary, 2) discharge summaries prepared by Peninsula Regional Medical Center detailing Gladys's care during her three admissions, 3) physician's notes prepared by the University of Maryland Medical Center during Gladys's admissions, 4)Gladys's death certificate, 5) excerpts from Corethia's answers to interrogatories, 6) Corethia's July 2, 2004 written notice of claim to the Treasurer, 7) excerpts from the deposition of Nurse Ilene Warner Maron, and 8) excerpts from the deposition of Dr. Michael L. Silverman.

3. Corethia attached to her opposition two exhibits: Gladys's death certificate and the July 2, 2004 letter.

the non-moving party, were as follows. On December 4, 2002, Gladys fell at home, breaking her right kneecap. She was admitted to the Center for care related to this injury. At the time of her admission, she was suffering from a multitude of long-standing medical problems, including chronic kidney failure, for which she was on hemodialysis; insulin-dependent diabetes with associated eye inflammation and kidney disease; high blood pressure; high cholesterol; and a history of arrhythmias for which a pacemaker had been implanted.

As part of the treatment for Gladys's broken kneecap, health care providers at the Center placed an "immobilizer device" (a type of cast) on her right leg. On December 11, 2002, a physician noted that Gladys had developed blisters on her right ankle "due to irritation from [illegible] immobilizer."

Gladys was discharged from the Center on December 27, 2002.

Less than one month later, on January 21, 2003, Gladys was admitted to Peninsula Regional Medical Center ("PRMC"), complaining of "right leg pain," among other symptoms. She was found to have a blockage of her right femoral artery and a narrowing of her left femoral artery.[4] During this hospitalization, a doctor observed and noted that Gladys had "a dry ulcer on the right heel and ankle, chronic in nature."

Gladys was discharged from PRMC on January 25, 2003, "to be followed as an outpatient."

On March 2, 2003, Gladys was re-admitted to PRMC with complaints of pain in her "right lower extremity," *i.e.*, her right leg. Her treating doctors determined that the blockage of her right femoral artery had persisted. They transferred her to the University of Maryland Medical Center ("UMMC") for surgery to bypass the blockage.

After her surgery, on March 13, 2003, Gladys was readmitted to the Center for follow-up care. A physician at the Center noted Gladys's history of having "an ulcer on the right

---

4. The femoral artery is in the thigh.

Achilles area, secondary to placement of a cast [referring to the immobilizer device] in December[.]"

By early April, Gladys had developed an "abscess of the right Achilles area due to decubitus ulcer secondary to a cast." [5] Her condition deteriorated and she began manifesting signs of a serious infection, including drainage at the sites of her recent surgical incision and her abscess, and delirium. By May 20, 2003, Gladys's wounds were producing "thick odorous green drainage," according to her treating nurses.

On June 2, 2003, Gladys was transferred to PRMC with symptoms of "probable sepsis." Then, on June 4, she was transferred to UMMC, suffering from an apparent soft-tissue infection of her right leg. Her condition was grave. Five days later, on June 9, she underwent surgery to amputate her right leg above the knee, as a consequence of the infection.

Unfortunately, the surgery failed to eradicate Gladys's infection. On June 12, 2003, her doctor at UMMC recommended as a last resort radical amputation of Gladys's right leg at the hip joint. In conference with her family members, she decided against the surgery.

On June 30, 2003, Gladys was returned to the Center for wound care and pain management. Her condition continued to deteriorate and, by July 8, 2003, she was "considered terminal." Shortly thereafter, after consultation with the family, and with their consent, dialysis was discontinued. Gladys died on July 12, 2003. Her death certificate lists the immediate cause of death as "renal failure[.]" "Above knee amputation-right with [E.] coli infection" is listed as an "other significant condition[ ] contributing to death[.]"

As already noted, Corethia submitted her written claim to the State Treasurer's office on July 2, 2004.

After hearing arguments on the summary judgment motion, the Court ruled as follows as to the survival action:

---

5. A "decubitus ulcer" is more commonly known as a bed sore.

I agree with [counsel for Corethia] that death is the ultimate injury, but I don't think that the notice requirement[ ] runs from the final injury or the worst injury, and it does seem clear even looking at it in the light most favorable to the Plaintiffs that the injury occurred more than one year prior to the date on which notice was given. So I am going to grant the motion as to Count One.

### The Nature of A Survival Action

At common law, an individual's cause of action in tort abated at death. In 1888, the Maryland General Assembly enacted a statute "which not only prevented a pending action from abating, but also empowered the decedent's representative to commence an action subsequent to death." *Benjamin v. Union Carbide Corp.*, 162 Md.App. 173, 187, 873 A.2d 463 (2005), *aff'd*, 394 Md. 59, 904 A.2d 511 (2006).[6]

A "survival action" is so named because the decedent's personal representative "is essentially bringing an action that the decedent could have brought had he or she not died." *Lopez v. Maryland State Highway Admin.*, 327 Md. 486, 490, 610 A.2d 778 (1992). The personal representative "serves as the posthumous agent of the victim"; the survival action "arises from the tortious infliction of injury upon the victim"; and "damages are measured in terms of *harm to the victim[.]*" *Benjamin, supra*, 162 Md.App. at 202, 873 A.2d 463 (quoting *Globe Am. Cas. Co. v. Chung*, 76 Md.App. 524, 526–27, 547 A.2d 654 (1988) (emphasis in original), *vacated on other grounds*, 322 Md. 713, 589 A.2d 956 (1991)). "[T]hus, death is irrelevant" to a survival action. *Id.* at 203, 873 A.2d 463.

---

**6.** The present survival statute is codified at Md.Code (2001 Repl.Vol., 2006 Supp.), section 7–401(y) of the Estates and Trusts Article ("ET"), governing the powers of the personal representative. It provides that the personal representative "may prosecute, defend, or submit to arbitration actions, claims, or proceedings in any appropriate jurisdiction for the protection or benefit of the estate, including the commencement of a personal action which the decedent might have commenced or prosecuted[.]"

### The Written Claim Requirement of the MTCA

■ As discussed, *supra*, under the MTCA, a claimant must "submit[ ] a written claim to the Treasurer or a designee of the Treasurer *within 1 year after the injury* to person or property that is the basis of the claim." SG § 12–106(b) (emphasis added). Thus, in determining whether a written claim was timely submitted to the State Treasurer, the key inquiry is into the date of the "injury to person or property that is the basis of the claim."

In *Cotham v. Bd. of County Comm'rs*, 260 Md. 556, 273 A.2d 115 (1971), the Court construed a similar written claim provision in a predecessor statute to the Local Government Tort Claims Act ("LGTCA"). The plaintiff sued Prince George's County and an individual doctor for malpractice allegedly committed at a county hospital. In an amended complaint, she alleged that she had submitted her written claim to the county commissioners "upon discovery of the negligence[.]" *Id.* at 559, 273 A.2d 115. The controlling tort claims statute, then codified at Md.Code (1957), Art. 57, section 18, stated:

> No action shall be maintained and no claim shall be allowed against [Prince George's County] for unliquidated damages for any injury or damage to person or property unless ... written notice thereof setting forth the time, place and cause of the alleged damage, loss, injury or death shall be presented ... to the county commissioners[.]

The notice was required to be made "within 180 days" [7] "after the injury or damage was sustained[.]" *Id.* The circuit court dismissed the plaintiff's malpractice claim for failure to give timely notice pursuant to section 18.

■ On appeal, the plaintiff conceded that her injury was apparent when she was discharged from the county hospital. She argued, however, that she did not discover the negligence of the hospital health care provider until more than a year later and that the judicially created "discovery rule" controlled

---

7. For actions brought against certain other counties, written notice was required within 90 days. *Id.*

when her "injury or damage was sustained." Under the "discovery rule," for statute of limitations purposes, a cause of action in tort does not "accrue," under the general limitations statute (now codified at Md.Code (2006 Repl.Vol.), section 5–101 of the Courts & Judicial Proceedings Article ("CJ")) until such time as the plaintiff was on inquiry notice of the alleged wrong. *Benjamin, supra,* 162 Md.App. at 192, 873 A.2d 463 (discovery rule is an exception to the general rule that "cause of action accrues at the time of the wrong"); *See also Hahn v. Claybrook,* 130 Md. 179, 100 A. 83 (1917) (first recognizing the discovery rule in the context of a medical malpractice case); *Poffenberger v. Risser,* 290 Md. 631, 431 A.2d 677 (1981) (extending application of the discovery rule to all tort actions).

The *Cotham* Court rejected the plaintiff's argument. It held that the date of her actual injury, not the date she discovered the malpractice that caused her injury, was controlling. This was so, the Court explained, because although the "discovery rule" applies to the concept of "accrual," for limitations purposes, it does not apply to a notice of claim requirement that is a condition precedent to maintaining a cause of action. *Cotham, supra,* 260 Md. at 561–62, 273 A.2d 115. The Court concluded that the written claim provision in question was not a statute of limitations; rather, it was a condition precedent to the filing of a suit. SG § 12–106(b).

In *Haupt v. State,* 340 Md. 462, 667 A.2d 179 (1995), the Court of Appeals extended the principle in *Cotham* to the written claim provision of the MTCA.[8] In that case, Haupt was driving out of a parking lot onto a roadway when her car collided with another automobile. Three years later, the other driver sued her for negligence. Haupt timely answered and thereafter filed a third-party complaint against the State, for contribution or indemnity. She alleged that her view of the roadway had been obstructed by overgrown trees and brush

---

8. *See also Simpson v. Moore,* 323 Md. 215, 592 A.2d 1090 (1991), in which, in the context of a jurisdictional challenge, the Court held that the written claim provision of the MTCA was not jurisdictional in nature; rather, it created a condition precedent to filing suit.

on adjoining State property that had been inadequately main-tained.[9]

The State successfully moved to dismiss Haupt's third-party claim on the ground that she had not submitted a written claim to the State Treasurer within 180 days of the accident, as then required by SG section 12–106(b)(1).[10] The case against Haupt went to trial and resulted in a verdict in favor of the other driver. On appeal, Haupt argued, among other things, that the circuit court should not have dismissed her third-party claim for non-compliance with the written notice requirement of the MTCA because her "injury," within the meaning of SG section 12–106(b)(1), occurred when the other driver obtained a judgment against her, not when the accident occurred.

The Court agreed, in part, with Haupt's argument. It opined that the purpose of the MTCA's written claim require-ment is

> to give the State early notice of claims against it. That early notice, in turn, affords the State the opportunity to investigate the claims while the facts are fresh and memo-ries vivid, and, where appropriate, settle them at the earli-est possible time.

340 Md. at 470, 667 A.2d 179 (internal citations omitted). It reasoned that, "When [a] tort claim is made by the plaintiff in the underlying action, it is patent that *the 180–day period begins to run as soon as the plaintiff or the plaintiff's property is injured, i.e.,* from the time of the accident." *Id.* at 472, 667 A.2d 179 (emphasis added). At that time, the legally operative facts to support the elements of a tort claim are in existence.

---

**9.** Haupt originally brought her third-party claim against Anne Arundel County on this theory. Because the land in question was owned by the State, the County was dismissed from the case.

**10.** At that time, the MTCA provided 180 days to file notice of a claim. The statute was amended in 1994 to allow one year.

By contrast, the legally operative facts permitting the filing of a third party claim for contribution or indemnity are not in existence when the injury to the plaintiff or his property occurs. *Id.* at 474, 667 A.2d 179. *See Hartford Accident and Indem. Co. v. Scarlett Harbor Assocs. Ltd. P'Ship,* 109 Md. App. 217, 283, 674 A.2d 106 (1996) (noting that third party claims are "contingent" upon a defendant/third party plaintiff's liability to the plaintiff in the underlying action), *affirmed,* 346 Md. 122, 695 A.2d 153 (1997). Rather, a defendant/third party plaintiff seeking contribution or indemnity is not "injured," within the meaning of SG section 12–106(b)(1), until he is sued by the plaintiff, at which time he first faces the possibility of liability that is a factual predicate for recovery of contribution or indemnity.

Thus, the Court held that Haupt was "injured," for purposes of her claim against the State for contribution or indemnity, when the other driver sued her. Because she filed a written claim against the State within 180 days of that date, she complied with the written claim provision of the MTCA, and the trial court erred in concluding otherwise.

In *Heron v. Strader,* 361 Md. 258, 761 A.2d 56 (2000), the Court of Appeals analyzed when an injury occurs under the written claim provision in the LGTCA, codified at CJ sections 5–301, *et seq.,* which is similar to the written claim provision of the MTCA.[11] In that case, on August 24, 1997, the plaintiff was arrested by Prince George's County police officers and charged with certain crimes. On March 3, 1998, he was acquitted on all charges. He submitted a written notice of claim to Prince George's County on April 30, 1998, alleging

---

11. CJ section 5–304 provides in pertinent part:

 (b)Except as provided in subsections (a) and (d) of this section, an action for unliquidated damages may not be brought against a local government or its employees unless the notice of the claim required by this section is given within 180 days after the injury.

 \* \* \*

 (c) ... (3) The notice shall be in writing and shall state the time, place, and cause of the injury.

violations of his civil rights and various other wrongs committed against him.

On June 1, 1998, the plaintiff filed suit against the county, stating, *inter alia,* causes of action for false imprisonment, false arrest, and malicious prosecution. The defendant moved to dismiss on the ground that the plaintiff's written notice of claim had not been filed within 180 days of the injury, in conformity with CJ section 5–304. The circuit court granted the motion.

On appeal, the Court of Appeals affirmed in part and reversed in part. It summarized its holding in *Haupt* as follows: "We held that notice had to be given when the 'legally operative facts' permitting the filing of the claim came into existence." *Heron, supra,* 361 Md. at 263, 761 A.2d 56. The Court explained:

> Petitioner's injury, therefore, occurred, pursuant to [the LGTCA], when his causes of action arose, i.e., when the legally operative facts permitting the filing of his claims came into existence. In order to determine when Petitioner's causes of action[ ] arose, we must examine the elements of the cause of action, since, under this Court's precedents, a cause of action is said to have arisen " 'when facts exist to support each element.' "

*Id.* at 264, 761 A.2d 56 quoting *Owens–Illinois v. Armstrong,* 326 Md. 107, 121, 604 A.2d 47 (1992) (quoting in turn *Owens–Illinois v. Armstrong,* 87 Md.App. 699, 724–25, 591 A.2d 544 (1991)).

Applying this principle of law to the facts alleged, the Court concluded that the plaintiff's causes of action for false arrest and false imprisonment arose on the day he was arrested, because all of the elements of those claims existed at that time; and hence the date of the arrest was the date of injury, for purposes of CJ section 5–304. The circuit court properly dismissed those causes of action, the Court held, because the plaintiff had not submitted his written claim to the county within 180 days of his injury.

By contrast, the Court concluded that the plaintiff's cause of action for malicious prosecution did not arise until such time as he was acquitted of the charges. The acquittals were legally operative facts that had to have occurred before the plaintiff's cause of action for malicious prosecution could exist. As such, the plaintiff's malicious prosecution injury, within the meaning of CJ section 5–304, occurred less than 180 days before he gave written notice of claim to the county; and for that reason, the circuit court erred in dismissing that claim.

### Analysis

Returning to the case at bar, we must decide under the controlling statute and the holdings in *Cotham, Haupt,* and *Heron* when, based on the summary judgment record, the legally operative facts permitting Gladys to bring suit for medical negligence came into existence. More precisely, we need to determine whether the elements of Gladys's cause of action for medical negligence came into existence before July 2, 2003, one year before Corethia submitted her notice of claim.

We begin by reciting the well-established elements of a cause of action in negligence: " '(1) that the defendant was under a duty to protect the plaintiff from injury, (2) that the defendant breached that duty, (3) that the plaintiff suffered actual injury or loss, and (4) that the loss or injury proximately resulted from the defendant's breach of the duty.' " *Chicago Title Ins. Co. v. Allfirst Bank,* 394 Md. 270, 290, 905 A.2d 366 (2006)(quoting *Valentine v. On Target, Inc.,* 353 Md. 544, 549, 727 A.2d 947 (1999)). In the context of medical malpractice, the elements translate into a duty of care owed by the health care provider to the patient; a breach of the applicable standard of care; proximate causation of a medical injury; and damages. *See, e.g., Dingle v. Belin,* 358 Md. 354, 368, 749 A.2d 157 (2000); *Sterling v. Johns Hopkins Hosp.,* 145 Md.App. 161, 168–69, 802 A.2d 440 (2002). An "injury" occurs for purposes of a medical malpractice action at such time as a negligent act is coupled with some harm. *Hill v. Fitzgerald,* 304 Md. 689, 696, 501 A.2d 27 (1985).

The parties agree that the facts underlying three of the four elements of a cause of action for medical negligence—duty, breach of the applicable standard of care, and causation—were in existence before July 2, 2003. Under Corethia's theory of the case, the Center's health care providers owed Gladys a duty of care at all times that she was a patient there. They first breached the standard of care in December 2002, by improperly placing the immobilizer device. That breach of duty caused Gladys to develop a sore on her right heel. The Center's health care provider agents then further breached the standard of care during Gladys's second admission—from March 13, 2003 through June 2, 2003—by failing to diagnose and properly treat the infection that developed in the sore on Gladys's right heel and eventually spread into the adjoining wound in her leg from bypass surgery. The infection was a proximate cause of the amputation of Gladys's right leg and, ultimately, her death.

■ The parties' point of dispute concerns when Gladys suffered the injury element of her medical negligence cause of action, for purposes of SG section 12–106(b)(1). Corethia maintains that Gladys was not actually injured until she died because, prior to her death, she could not have known that the infection she had developed was an E. coli infection. She argues that the "discovery rule," as it has been judicially engrafted upon CJ section 5–101, the general three-year statute of limitations, and codified in CJ section 5–109, a specific statute of limitations for medical malpractice actions, applies to the MTCA's written claim requirement in SG section 12–106(b).

The State counters that Gladys suffered an injury within the meaning of SG section 12–106(b) no later than June 2, 2003, more than one year before Corethia submitted her written claim to the State Treasurer. The State maintains that Gladys's injury was the infection that developed from the untreated sore on her right heel, which necessitated the amputation of her right leg above the knee. Thus, the progression of the localized infection caused by the original

negligent act, and the continuing failure to treat that infection, proximately caused a physical injury and attendant pain and suffering for which Gladys could have recovered damages in a medical malpractice action, but for her death. The State asserts that the "discovery rule" has no application to the MTCA written claim requirement, which is a condition precedent to filing suit, not a statute of limitations.

 The holdings in *Cotham, Haupt,* and *Heron* do not support Corethia's argument or an application of the "discovery rule" to the MTCA written claim statute. *Cotham* plainly held that the discovery rule does not apply to a statutory notice of claim requirement because such a requirement is a condition precedent to filing suit, *i.e.*, an act that must be fulfilled for immunity from suit to be waived, and thereby creating an otherwise non-existent right to sue, not a statute of limitations that places a time-bar on an already-existing right to sue.

*Haupt* did not change the *Cotham* holding. It merely clarified that a potential plaintiff in a tort action against the State is not required to give the State notice of the existence of her claim before the facts comprising the elements of her cause of action have come into existence. Otherwise, a potential plaintiff, in order to sue the State for a particular cause of action, would have to give the State notice of the cause of action even before it existed. Obviously, a potential plaintiff cannot give notice of a cause of action before it has come into existence.

*Heron* applied the holdings in *Cotham* and *Haupt* to a number of different causes of action. Its holding illustrates that, for a single potential plaintiff, there may be more than one date by which a notice of claim must be submitted, depending upon the number and nature of the cause(s) of action on which the potential plaintiff intends to sue.

 None of these holdings adopt or apply the discovery rule to a notice of claim requirement. They do not concern *knowledge* on the part of a potential plaintiff of facts, wrongs, opinions, or anything; rather, they concern the *existence vel*

*non* of the facts that make up the elements of a given cause of action, irrespective of knowledge. The principle the holdings establish is that a potential plaintiff (*i.e.*, claimant) must submit her claim to the government entity she plans to sue within the statutorily designated time limit after the elements of her cause of action have come into existence.

In this case, by June 2, 2003, Gladys had received substandard medical treatment from State health care providers who owed her a duty of care; and the substandard treatment had caused a sore on her right foot that had become so seriously infected that it had spread to her right leg. According to the PRMC records, on June 4, 2003, a culture of Gladys's ankle wound grew "moderate E. coli." By June 9, 2003, the infection in Gladys's right leg was so extensive that it was amputated above the knee.

If the amputation had successfully eliminated the infection, Gladys could have initiated a medical negligence action for the loss of the lower portion of her right leg. Thus, by June 9, 2003, the facts constituting the injury element of Gladys's cause of action for medical negligence were in existence. Her death a little over a month later did not abate her cause of action because Corethia, as personal representative of her estate, could maintain the action on her behalf. The written notice provision of the MTCA required, however, that notice of Gladys's claim against the State be submitted no later than one year after "the injury [to Gladys] that is the basis of the claim." SG § 12–106(b)(1). On the undisputed material facts, Corethia failed to submit her notice of claim within one year after that injury.

Corethia also argues in her brief that summary judgment should not have been granted because there was a genuine dispute of material fact as to when Gladys was diagnosed with an E. coli infection "above her knee amputation," and when the particular strain of E. coli with which she was infected was diagnosed. According to Corethia, that diagnosis was not made until July 3, 2003, less than one year before the written claim was submitted.

■ Before the circuit court, in response to the motion for summary judgment, Corethia did not assert that there was any genuine dispute of material fact; indeed, she took the contrary position. Thus, this issue is not preserved for review. *See* Rule 2–501 (in response to a motion for summary judgment, the opposing party shall "identify with particularity each material fact as to which it is contended there is a genuine dispute"); *Beyer v. Morgan State University,* 139 Md.App. 609, 636, 779 A.2d 388 (2001), *aff'd,* 369 Md. 335, 800 A.2d 707 (2002) (stating that, when there is a failure to identify material facts in dispute and to proffer admissible evidence on the disputed issues at the summary judgment stage, the argument is not preserved for review on appeal).

In any event, the issue lacks merit. The point in time when Gladys was diagnosed with an E. coli infection in the remaining portion of her right leg is not material to the question of when she was injured, for purposes of SG section 12–106(b)(1). As explained, *supra,* by the time the amputation occurred, an injury had been sustained.

The facts underlying a cause of action for medical negligence were in existence at the very latest on June 9, 2003. Therefore, according to the controlling statute and case law, the one-year period for submitting a written claim to the State Treasurer had started to run by then. The precise date on which further spread of the E. coli infection to the remaining portion of the right leg was discovered, and the date on which the particular E. coli strain became known, would not alter that. For that reason, they are not facts material to the deadline for submitting a written claim under SG section 12–106(b)(1). *See Debbas v. Nelson,* 389 Md. 364, 373, 885 A.2d 802 (2005) (material fact is one that, depending how it is decided, will affect the outcome of the case).

On the undisputed material facts, Corethia did not submit a written claim for the survival action within the one-year period required by the MTCA, and consequently failed to satisfy a condition precedent to the waiver of sovereign immunity. For

that reason, the circuit court did not err in granting summary judgment to the State on the survival action.[12]

## II.

### *Christal's and Chantel's Wrongful Death Claims*

The circuit court granted summary judgment in favor of the State on Christal and Chantel's wrongful death claims upon a

---

**12.** We note that, even if the discovery rule were applicable, the result would be the same. In *Georgia–Pacific Corp. v. Benjamin*, 394 Md. 59, 89, 904 A.2d 511 (2006), the Court of Appeals explained the nature of the knowledge the injured party must possess before the cause of action accrues:

> [S]ufficiency of the actual knowledge to put the claimant on inquiry notice[ ] concerns the nature and extent of actual knowledge necessary to cause an ordinarily diligent plaintiff to make an inquiry or investigation that an injury has been sustained. For inquiry notice, a person must have actual notice, either express or implied. Express knowledge is direct, whether written or oral, from sources cognizant of the fact[s]. *Implied notice occurs when a plaintiff gains knowledge sufficient to prompt a reasonable person to inquire further.*

(Internal citations omitted; emphasis added.) If a party is on inquiry notice based on express or implied knowledge of certain facts, it also must follow that "after a reasonable investigation of facts, a reasonably diligent inquiry would have disclosed whether there is a causal connection between the injury and the wrongdoing." *Id.* at 90, 904 A.2d 511 (footnote omitted).

On the undisputed material facts in the summary judgment record, Gladys was on inquiry notice of her injury and its cause no later than June 9, 2003. As of that date, Gladys had been diagnosed with a severe infection and had undergone surgery to amputate her right leg above the knee in an attempt to control the infection. At this stage, Gladys's injury was more than apparent; she had lost a portion of her right leg.

Moreover, a reasonable investigation at that point in time would have revealed that the infection was proximately caused by the ulcer that resulted from the improper placement of the "immobilizer device" in December 2002 and the failure of health care providers at the Center to take adequate steps to treat the infection prior to Gladys's transfer to PRMC on June 2, 2003. Indeed, the notes prepared by the Center upon Gladys's admission on March 13, 2003, reveal that the ulcer on Gladys's right heel resulted from the placement of the cast. Also, as of June 4, during Gladys's admission to PRMC, her right ankle wound was positive for E. coli, according to notes prepared by the attending physician. These facts would have come to light in the course of any reasonably diligent investigation. Thus, Gladys had implied knowledge of both the fact of her injury and the cause of the injury no later than June 9, 2003.

finding that, on the undisputed material facts, they did not submit a written claim to the State and therefore the State did not waive sovereign immunity as to their claims.

The undisputed material facts on which the court ruled are as follows. On July 2, 2004, counsel for Corethia submitted a letter to the State Treasurer stating that Corethia, as personal representative and daughter of the decedent, "claims that Deer's Head Center provided substandard nursing care to [Gladys] that resulted in her death on July 12, 2003. As a result, Corethia Copes demands $1,000,000 in compensatory damages for the wrongful death of [Gladys]." The letter gave Corethia's address and that of the Center. It went on to recount in 10 single-spaced paragraphs the particulars of the malpractice allegations.

Although the letter identified Corethia as a daughter of the decedent, it said nothing about her two sisters (or any siblings) and did not in any way indicate whether Gladys had any potential wrongful death beneficiaries other than Corethia. Neither Christal nor Chantel, individually or through counsel, submitted a separate written claim to the Treasurer.

In their cross-appeal, Corethia, Christal, and Chantel contend that the court's summary judgment ruling was legally incorrect. Specifically, they argue that Christal and Chantel substantially complied with the written claim requirement of the MTCA, by virtue of Corethia's letter to the Treasurer. The State counters that the undisputed material facts were legally insufficient to support a finding of substantial compliance on the part of Christal and Chantel.

### The Nature of a Wrongful Death Action

At common law, there was no cause of action for wrongful death. That cause of action is a creature of statute, enacted in derogation of the common law. Maryland first enacted a wrongful death act ("WDA") in 1852.

In an action for wrongful death, certain beneficiaries of the decedent, identified in the WDA, may recover damages for the loss of the decedent. A "child" of the decedent is a primary

beneficiary, under CJ section 3–904(a). Moreover, under CJ section 3–904(e), an adult child may recover damages, both pecuniary and non-economic, for the death of that child's parent.

Two other provisions of the WDA are pertinent. First, CJ section 3–904(c), entitled "Damages to be divided among beneficiaries," states that in a wrongful death action, damages "may be awarded to the beneficiaries proportioned to the injury resulting from the wrongful death." Second, CJ section 3–904(f), entitled "Restriction to one action under this subtitle," states:

> Only one action under this subtitle lies in respect to the death of a person.

Rule 15–1001 governs the procedure for wrongful death actions. It provides, at subsection (b), that, "[i]f the wrongful act occurred in this State" (about which there is no dispute in the case at bar), "all persons who are or may be entitled by law to damages by reason of the wrongful death shall be named as plaintiffs whether or not they join in the action. The words 'to the use of' shall precede the name of any person named as a plaintiff who does not join in the action."

The parties do not dispute that Corethia's letter to the State Treasurer complied or substantially complied with the requirements of SG sections 12–106 and 12–107, with respect to her wrongful death claim. Christal and Chantel did not submit separate written claims to the Treasurer, however. And, to the extent that any action for wrongful death were to be filed, all three sisters would have to be parties, either as plaintiffs or use plaintiffs, and no other action for wrongful death could be brought. CJ § 3–904(f). Corethia filed the wrongful death action as the sole plaintiff. She amended her complaint to add her sisters as "use plaintiffs," and then further amended it to join them as plaintiffs.

 Christal and Chantel maintain that, because Corethia's July 2, 2004 letter informed the State Treasurer about the cause of action the State was facing for the wrongful death of Gladys Copes, and there only can be one cause of action for

the wrongful death of a person, they complied with the notice of claim requirements of the MTCA by virtue of Corethia's letter.

We first consider whether SG section 12–106 requires every potential beneficiary under the WDA to submit a separate written claim. As discussed, *supra*, SG section 12–106 directs that "[a] claimant may not institute an action under this subtitle unless: (1) the claimant submits a written claim to the Treasurer or a designee of the Treasurer within 1 year after the injury to person or property that is the basis of the claim." The term "claimant" is not defined within the subtitle.

Under the "State Insurance Programs" subtitle of the Code of Maryland Regulations ("COMAR"), the State Treasurer's Office has promulgated regulations relevant to our inquiry. The subtitle is divided into four chapters related to the MTCA: 1) General, 2) Coverage and Limits, 3) Claims Administration, and 4) Actions. The first chapter, COMAR 25.02.01.02, entitled "Definitions," states that a "claimant" is "a person described in COMAR 25.02.03.02 who submits a claim under the [MTCA] to the Treasurer." The referenced section in the "Claims Administration" chapter, COMAR 25.02.03.02, entitled "Who May File," provides in pertinent part:

C. Death. A claim for death may be submitted by the decedent's personal representative on behalf of the decedent's estate or by any other person legally entitled to assert this claim in accordance with applicable state law, or by the duly authorized attorney or legal representative of either.

COMAR 25.02.03.05, entitled "Documentation," states:

A. Death. In support of a claim for death, the claimant may be required to submit the following evidence or information:

\* \* \*

(3) Identification by full name, address, birthdate, kinship, and marital status of each of the decedent's survivors, including identification of those survivors who were depen-

dent for support upon the decedent at the time of the decedent's death;

* * *

(7) If damages for pain and suffering before death are claimed, a physician's detailed statement specifying the:

 (a) Injuries suffered,

 (b) Duration of pain and suffering,

 (c) Drugs administered for pain, and

 (d) Decedent's physical condition in the interval between injury and death[.]

Finally, the "Coverage and Limits" chapter, COMAR 25.02.02.02, entitled "Self–Insurance," provides in pertinent part,

 D. Limits of Liability. Within total budgeted funds available for self-insurance coverage of tort claims, the limits of State liability shall be:

(1) Subject to § D(2) of this regulation, $200,000 per claimant for all injury, loss, and damage to person and property arising from a single incident. For the purpose of determining the limits of liability under this subsection, all persons claiming damages resulting from:

 (a) *Bodily injury to, or the death of, any one person shall be considered to be one claimant;* . . .

(2) Such greater, lesser, or additional limits as otherwise may be established by the annual State Budget for incidents occurring during that fiscal year.

(Emphasis added.)

■■■■■■ Administrative regulations have the force of law when they are "legislative" and not merely "interpretive." *Dept. of Public Safety and Correctional Servs. v. Beard,* 142 Md.App. 283, 300, 790 A.2d 57 (2002) (citing *Waverly Press, Inc. v. State Dep't of Assessments and Taxation,* 312 Md. 184, 191, 539 A.2d 223 (1988)). A regulation is "legislative" when it " 'affects individual rights and obligations' " and "the agency intended the rule to be legislative as 'evidenced by such circumstantial evidence as the formality that attended the

making of the law, including rule making procedure and publication.'" *Id.* at 301, 790 A.2d 57 (citation omitted). Moreover, a "legislative" regulation is enacted under the authority of an express delegation of power from the legislature. *See Comptroller of Maryland v. Miller,* 169 Md.App. 321, 346, 901 A.2d 229 (2006) (a legislative rule "is the product of an exercise of delegated legislative power to make the law through rules") (citation omitted).

An "interpretive" regulation, in contrast, "simply state[s] what the administrative agency thinks the statute means, and only 'remind[s]' affected parties of existing duties." *Secretary, Dep't of Public Safety and Correctional Servs. v. Demby,* 390 Md. 580, 604–05, 890 A.2d 310 (2006)(quoting *United States v. Ellen,* 961 F.2d 462, 465 (4th Cir.1992)). While an interpretive regulation does not carry the force of law, it is entitled to deference because it reflects the agency's interpretation of its own statute. *See Bd. of Trustees of Maryland Teachers & State Employees Supplemental Retirement Plans v. Life and Health Ins. Guar. Corp.,* 335 Md. 176, 195, 642 A.2d 856 (1994); *Smack v. Department of Health and Mental Hygiene,* 134 Md.App. 412, 420, 759 A.2d 1209 (2000).

The regulations pertinent to the case at bar bear indicia of both legislative and interpretive regulations. They "affect individual rights and obligations" in that they set forth who may give notice of claim under the MTCA and thus, the procedure for meeting the condition precedent to suing the State for its tortious conduct. The regulations also were published in the *Maryland Register* and went through notice and comment prior to final adoption. 17:1 Md. R. 92 (Jan. 12, 1990) (notice of proposed action); 17:7 Md. R. 853 (Apr. 6, 1990) (final adoption). "[S]ubmission of a regulation via the notice and comment procedures of the APA alone is not determinative of whether a regulation is a law," however, because Maryland is unique in that " 'an agency's organizational rules, procedural rules, interpretive rules and statements of policy *all* must go through the same procedures as required for legislative rules.'" *Demby, supra,* 390 Md. at 607

n. 13, 890 A.2d 310 (quoting *Eng'g Mgmt. Servs., Inc. v. Maryland State Highway Admin.*, 375 Md. 211, 232–33, 825 A.2d 966 (2003) (quoting Arnold Rochvarg, *Maryland Administrative Law*, 154–55 (2001))).

While no legislative delegation of rule making authority is found in the MTCA, the State Treasurer is granted authority under Md.Code (2006 Repl.Vol.), section 9–104 of the State Finance and Procurement Article ("SFP"), entitled "General powers and duties of Treasurer," to "adopt necessary regulations: (1) to set policies and procedures for payment on losses, including adjustment and approval. . . ." Given the absence of an express delegation of authority to promulgate regulations in the State Government Article, we shall treat the relevant COMAR provisions as interpretive regulations and accord them appropriate deference.

 As always, our goal in statutory interpretation is to "ascertain and effectuate" the intent of the legislature. *Mayor and Town Council of Oakland v. Mayor and Town Council of Mountain Lake Park*, 392 Md. 301, 316, 896 A.2d 1036 (2006). Our starting point in this pursuit is the language of the statute itself. *Reier v. State Dep't of Assessments and Taxation*, 397 Md. 2, 26, 915 A.2d 970 (2007). If the language is clear and unambiguous, "either inherently or by reference to other relevant laws or circumstances," we give effect to the words of the statute as written. *City of Baltimore Dev. Corp. v. Carmel Realty Assocs.*, 395 Md. 299, 318, 910 A.2d 406 (2006)(quoting *Chow v. State*, 393 Md. 431, 443–44, 903 A.2d 388 (2006)). Where ambiguity exists, *i.e.*, where two reasonable alternative interpretations exist, "we may employ all the resources and tools of statutory construction at our disposal, including legislative history, prior case law, and statutory purpose." *Reier, supra*, 397 Md. at 27, 915 A.2d 970 (internal citations omitted).

Pursuant to SG section 12–106, only a "claimant" must submit a written claim to the State Treasurer. The term "claimant" is not defined in the statute, nor does the statute otherwise identify who qualifies as a "claimant" in either a

survival or a wrongful death action. The statute thus is not clear on that point.

The State Treasurer, in COMAR 25.02.03.02, which in turn refers to COMAR 25.02.03.02, has interpreted the meaning of "claimant" in that context. When the claim involves death, COMAR 25.02.03.02 provides that a claim may be filed by "the decedent's personal representative ... or by any other person legally entitled to assert this claim in accordance with applicable state law ..." The regulations thus make no distinction between survival and wrongful death actions. Their plain language would allow a personal representative of the decedent's estate or any statutory wrongful death beneficiary to submit the written claim to the State Treasurer, for any claim resulting from a death.

Further support for this interpretation is found in COMAR 25.02.03.05, directing that in a "claim for death," the claimant "may be required" to provide the State Treasurer with the names of and other identifying information about the decedent's survivors. This regulation contemplates that a determination of potential beneficiaries under the WDA would be made as part of the State's investigation of the claim. If every beneficiary under the WDA were required to submit a separate written claim to the State Treasurer, COMAR 25.02.03.05 would be superfluous. SG § 12–102.

■ We conclude that, for the wrongful death of a decedent, not all beneficiaries under the WDA are required to file separate written claims with the State Treasurer. For purposes of SG section 12–106(b)(1), a "claimant" in a wrongful death action is either the personal representative of the decedent's estate or any lawful beneficiary under the WDA. Accordingly, once Corethia submitted a written claim on July 2, 2004, notifying the State Treasurer of her intention to bring a wrongful death action for the death of Gladys Copes, her sisters, Christal and Chantel, did not need to separately submit written claims in order to comply with SG section 12–106(b)(1). This interpretation is in keeping with the purpose of SG section 12–106(b)(1), as written notice of a wrongful

death action arising out of the death of one person gives the State sufficient information to investigate the claim as to all possible claimants. It also is in keeping with the legislative mandate to construe the MTCA "broadly, to ensure that injured parties have a remedy." [13]

## III.

### Corethia's Wrongful Death Claim

Finally, in its issue on appeal, the State contends that Corethia should not have been permitted to pursue her wrongful death claim because her sisters properly were precluded from suing for wrongful death; there can only be one cause of action for wrongful death; and because Chantel and Christal properly were precluded from suing for wrongful death, Corethia should have been so precluded as well.

We already have held that the circuit court erred by ruling that Chantel and Christal were barred by sovereign immunity from pursuing their wrongful death claims. Thus, we have rejected the predicate to the State's contention. [14]

**JUDGMENT IN FAVOR OF THE STATE ON SURVIVAL ACTION AFFIRMED; JUDGMENT IN FAVOR OF THE STATE ON WRONGFUL DEATH CLAIMS OF CHRISTAL AND CHANTEL COPES REVERSED; JUDG-**

---

**13.** There is no dispute that Corethia's July 2, 2004 letter was timely submitted as to the wrongful death action, as it was submitted within one year of the July 12, 2003 date of death. Unlike in a survival action, in a wrongful death action the death must occur for all elements of the action to be in existence.

**14.** We note, in passing, that, even if we had ruled to the contrary, *i.e.,* that Chantel and Christal could not pursue their wrongful death claims, we would find no merit in the State's argument.

To be sure, there only may be one cause of action for wrongful death. *See* CJ § 3–904(f). If one wrongful death beneficiary properly sues, and joins other potential beneficiaries as use plaintiffs, and the use plaintiffs do not or cannot join in the action as plaintiffs, that does not mean that the wrongful death beneficiary who properly sued cannot pursue her claim. Rather, it means that the use plaintiffs may not separately pursue another wrongful death action.

MENT IN FAVOR OF CORETHIA COPES ON WRONG-
FUL DEATH CLAIM VACATED AS TO DAMAGES
ONLY. CASE REMANDED TO THE CIRCUIT COURT
FOR WICOMICO COUNTY WITH INSTRUCTIONS TO
AMEND THE JUDGMENT OF LIABILITY ONLY FOR
WRONGFUL DEATH TO INCLUDE CHRISTAL AND
CHANTEL COPES AND FOR A NEW TRIAL ON DAM-
AGES. COSTS TO BE PAID 75% BY THE STATE OF
MARYLAND AND 25% BY THE APPELLANTS.